UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TROY D. SADLER, JR. and<br>MELINDA J. SADLER | CIVIL ACTION |
| VERSUS | |
| DANIEL A. ACKER, SCHWERMAN<br>TRUCKING, CONTINENTAL<br>CASUALTY COMPANY, STATE FARM<br>MUTUAL AUTOMOBILE INSURANCE<br>COMPANY | NO. 06-137-C-M2 |

**RULING & ORDER**

This matter is before the Court on the Motion to Compel Updated Independent Medical Examinations (R. Doc. 63) filed by defendants, Daniel A. Acker, Schwerman Trucking Company, and Continental Casualty Company (collectively "defendants"). Plaintiffs, Troy D. Sadler, Jr. ("Mr. Sadler") and Melinda Sadler ("Mrs. Sadler")(collectively "plaintiffs"), have not filed an opposition to this motion.

**FACTUAL & PROCEDURAL BACKGROUND**

This lawsuit stems from an automobile accident that occurred on January 6, 2006. As a result of such accident, plaintiffs contend that Mr. Sadler suffered a traumatic brain injury that has resulted in cognitive and behavioral impairment requiring twenty-four (24) hour care. The defendants have stipulated to 100% liability for the accident. Thus, at the trial of this matter, which is scheduled for June 7, 2010, the sole issue will be what injuries/damages were caused by the accident and what monetary amount will fairly compensate plaintiffs for Mr. Sadler's injuries.

Through the present motion, defendants seek to have the Court allow their experts,

Dr. Kevin Bianchini, Ph.D. (Neuropsychology) and Dr. Gary Glynn, M.D. (Physical Rehabilitation and Medicine), to perform updated independent medical examinations upon Mr. Sadler because a two (2) year period (740) days will have elapsed since the discovery deadline (May 31, 2008) at the time of the trial of this matter (June 7, 2010).[1]  The defendants contend that such examinations are warranted because plaintiffs' experts have had the opportunity to examine and evaluate Mr. Sadler since the discovery deadline expired in this case and because Mr. Sadler will have undergone an additional two (2) years of rehabilitation as a resident at the Neurological Rehabilitation Living Centers, L.L.C. ("NRLC") in Covington, Louisiana,[2] which has included additional testing and evaluation and changes in his medications, by the time of trial.  Defendants also note that, during this two (2) year period, Mr. Sadler has experienced significant changes in his marriage as well as changes in his cognitive and behavioral functioning that warrant additional evaluation by defense experts.  Defendants argue that, without giving their experts an opportunity to conduct an updated medical examination of Mr. Sadler, it will be difficult for them to defend against the plaintiffs' claims at trial since they will have no access to Mr. Sadler or his caregivers during the last eight (8) months prior to trial,[3] and their experts will not have had any access to him for over twenty-four (24) months.

---

[1] Dr. Bianchini's initial neuropsychogical evaluation and testing occurred on May 2, 2007 and May 5, 2007. Dr. Glynn's evaluation appears to have occurred in late January 2008 or early February 2008 since he had access to records from NRLC dated January 20, 2008, and he issued his report relative to that evaluation on February 14, 2008.

[2] In his report issued on June 27, 2007, Dr. Bianchini noted that Mr. Sadler had not had "formalized transitional or post acute brain injury rehabilitation," and he opined that a "transitional living or post acute rehabilitation would be helpful" to him and recommended that he be "enrolled in a transitional living or post-acute type of rehabilitation program."  In September 2007, Mr. Sadler was placed in such a program at NRLC.

[3] The last scheduled deposition of an NRLC caregiver was the deposition of Justin Moses, an NRLC staff member, on September 21, 2009.  Thus, that deposition is eight (8) months and seventeen (17) days before the first date of trial in this matter.

Defendants also argue that granting their motion will not prejudice the plaintiffs because the plaintiffs have never deposed Dr. Glynn or Dr. Bianchini, and the defendants have already consented to allowing plaintiffs to depose those experts prior to trial and after the experts have issued their supplemental reports regarding their updated examinations of Mr. Sadler.  Through their motion, defendants request that the Court compel plaintiffs to produce Mr. Sadler on or before February 7, 2010 for a one (1) day examination by Dr. Bianchini and for a three (3) day examination by Dr. Glynn at the Tuoro Rehabilitation Center, in New Orleans, Louisiana, which has post-acute day programming.  Defendants further represent that they will:  (1) arrange transportation to and from the NRLC for Mr. Sadler; (2) provide plaintiffs with a supplemental report regarding the updated evaluations on or before March 7, 2010; (3) bear the additional cost of having an NRLC staff member accompany Mr. Sadler to each day of the examination; and (4) will consent to scheduling the depositions of both defense experts *after* the issuance of their supplemental reports, which will be at least three (3) months before trial.

## **LAW & ANALYSIS**

Local Rule 7.5M of the Middle District of Louisiana requires that memoranda in opposition to a motion be filed within twenty (20) days after service of the motion.  The rule specifically provides:

> LR7.5M     Response and Memorandum
>
> Each respondent opposing a motion shall file a response, including opposing affidavits, memorandum, and such supporting documents as are then available, within 20 days after service of the motion. Memoranda shall contain a concise statement of the reasons in opposition to the motion, and a citation of authorities upon which the respondent relies.  For good cause appearing therefor, a respondent may be required

>to file a response and supporting documents, including memoranda, within such shorter or longer period of time as the court may order, upon written ex parte motion served on all parties.

The present motion was filed on October 1, 2009, and the Court's electronic filing system indicates that notice of the filing of such motion was served upon plaintiffs' counsel electronically on that same date at 2:10 p.m. CDT. More than twenty (20) days have elapsed since the service of the motion, and plaintiffs have failed to file any opposition. The motion is therefore deemed to be unopposed. In addition to the motion being unopposed, the Court finds that the motion has merit and should be granted for the reasons that follow.

Fed. R. Civ. P. 35(a)(2)(A) does not limit the number of independent medical examinations that may be ordered so long as "good cause" is shown for each exam. *Peters v. Nelson*, 153 F.R.D. 635, 637-38 (N.D. Iowa 1994). "Good cause" requires a showing of specific facts that demonstrate the need for the information sought and lack of means for obtaining it elsewhere. *Gaubert v. Mission Resources Corp.*, 2004 WL 877362 (E.D. La. 2004). One of the instances in which courts have found "good cause" to allow multiple examinations is where a "substantial time lag occur[s] between the initial examination and trial." *Peters*, at 638, citing *Lewis v. Neighbors Constr. Co.*, 49 F.R.D. 308 (W.D. Mo. 1969) and *Vopelak v. Williams*, 42 F.R.D. 387 (D.C. Ohio 1967). The number of examinations ordered should be held to the "minimum necessary considering the party's right to privacy and the need for the court to have accurate information." *Id.*, quoting *Schlagenhauf v. Holder*, 321 F.2d 43 (7th Cir. 1963), *vacated on other grounds*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). Where second examinations have been refused, the reason generally given is that there had been no showing of a change in the

plaintiff's situation. *Peters*, at 638.

In the present case, defendants have shown that a "substantial time lag" will occur between the initial examinations conducted by their experts and the time of trial and that "a change in [Mr. Sadler's] situation" has occurred since his initial exams, such that "good cause" exists for re-examination and testing by defense experts prior to trial. First, defendants have pointed out that plaintiffs' neuropsychologist expert, Dr. John Bolter ("Dr. Bolter"), has had the opportunity to re-examine and re-test Mr. Sadler since the May 31, 2008 discovery deadline expired. Specifically, Dr. Bolter conducted such examination on September 11, 2008, and ordered a second battery of neuropsychological testing, which was administered on October 10, 2008. *See*, Dr. Bolter's report dated September 11, 2008, Exhibit 15 to defendants' motion; Dr. Bolter's Deposition, Exhibit 16 to defendants' motion, p. 42; Dr. Bolter's October 10, 2008 report, Exhibit 21 to defendants' motion, p. 2. It would be unfair to allow the plaintiffs' expert an opportunity to re-examine and re-test Mr. Sadler outside the discovery deadline (particularly considering the procedural background of this case in which a great deal of depositions and discovery have occurred, through mutual agreement of the parties, after the discovery deadline expired) and not allow defendants' experts the same opportunity.[4]

---

[4] According to the procedural background of this case as set forth in defendants' motion, the parties, by mutual agreement, continued to voluntarily conduct discovery and depositions in this matter after the May 31, 2008 discovery deadline expired and without the filing of a formal motion to extend the discovery deadline. The following depositions were taken after expiration of the discovery deadline: Mr. Sadler (November 19, 2008); Mrs. Sadler (November 19, 2008); Jeb Sadler (January 15, 2009); Linda Gutierrez (May 15, 2009); Carol Whitmore (May 15, 2009); Stacy Levesque (May 15, 2009); Beth Salcedo (June 10, 2009); and Hector Gutierrez (June 10, 2009). The deposition of plaintiffs' expert, Dr. Bolter, was even taken after the expiration of the discovery deadline, on May 20, 2009. The parties then apparently engaged in a mediation on June 17, 2009, and defendants therefore postponed taking any further depositions in hopes that the matter would settle. The case was not settled, and following the mediation, plaintiffs' counsel apparently told defense counsel that he intended to enforce the old Scheduling Order with the May 31, 2008 discovery deadline and would only "allow" the defendants to depose those witnesses that he considered necessary. Thus, despite the fact that numerous depositions had been taken outside of the May 31, 2008 discovery deadline and the fact that Dr. Bolter had conducted an updated examination of Mr. Sadler after the

Furthermore, the Speech and Language Pathologists at the NRLC, Stacy Levesque ("Levesque") and Beth Salcedo ("Salcedo"), re-tested Mr. Sadler after expiration of the discovery deadline, in May 2009, administering the Wechsler Memory Scale III test, the Repeatable Battery for the Assessment of Neuropsychological Status test, the Behavioral Assessment of Dysexecutive Syndrome test, the California Verbal Learning Test, and the Ross Information Processing Assessment- 2nd edition test.  Mr. Salder showed significant improvement on those tests as compared to when they were previously administered in September 2007, and such cognitive re-testing will therefore be an important issue at trial.[5] The Court agrees with defendants that their experts should not be required to rely upon the re-testing of Mr. Sadler performed by Dr. Bolter, Levesque, and Salcedo, particularly since the accuracy of Levesque's 2009 re-testing has apparently already been called into

---

discovery cut-off, plaintiffs nevertheless refused to allow the updated medical examinations of Mr. Sadler by Dr. Bianchini and Dr. Glynn outside the discovery deadline.

On June 25, 2009, a pre-trial conference occurred in this case, at which time the Court denied a request by the defendants to re-open discovery.  The Court did, however, advise counsel that they could "stipulate to limited discovery and further advise[d] that if a stipulation can not be reached, [the] parties may file a motion with the court.  The motion filing deadline is October 1, 2009."  *See*, R. Doc. 58.  Since the parties were unable to agree on whether or not Dr. Glynn and Dr. Bianchini could conduct updated medical examinations of Mr. Sadler outside the discovery deadline, defendants filed the present motion in accordance with the October 1, 2009 deadline set by the Court.  The undersigned finds that the requested, updated medical examinations are just the type of limited discovery to which the district judge was referring in his June 25, 2009 Notice to Counsel and that the fact that the requested examinations will occur outside the May 31, 2008 discovery deadline is insignificant since the parties have essentially ignored that deadline by mutual consent with respect to numerous depositions.  Defendants are not seeking to re-open all discovery and add new experts; they are simply asking that their experts, who previously examined Mr. Sadler, be allowed the same opportunity as plaintiffs' experts to re-examine and re-test him during the two year period between the discovery cut-off and trial.

[5] When Mr. Sadler was initially administered the Wechsler Memory Scale III test in September 2007, he received a standard score of 78 for immediate memory, of 65 for delayed memory, and of 68 for total memory.  *See*, Speech-Language Evaluation dated September 25, 2007, Exhibit 9 to defendants' motion, p. 3.  Levesque found that those test results indicated a significant cognitive-communication disorder, characterized by severe-to-moderate deficits in cognitive aspects including immediate and delayed memory, temporal orientation (recent memory), spatial orientation, orientation to environment, and recall of general information.  *Id.*  When that test was re-administered to him in May 2009, after nearly two years of rehabilitation, Mr. Sadler received a standard score of 99 for immediate memory, of 92 for delayed memory, and of 95 for total memory.  Levesque classified Mr. Sadler's immediate and delayed auditory and visual memory at that time as being normal or in the "average" range.  *See*, Deposition of Levesque, Exhibit 14 to defendants' motion, p. 63-66.

question by the plaintiffs' experts.

Secondly, defendants have demonstrated that they did not learn of certain changes that occurred in Mr. Sadler's situation until after the May 31, 2008 discovery deadline and that they are entitled to have their experts examine how those changed circumstances have impacted Mr. Sadler's alleged cognitive and behavioral impairments.  Specifically, on February 5, 2008 (Mardi Gras day), nine (9) months after Dr. Bianchini administered neuropsychological testing to Mr. Sadler, Mr. Sadler's son apparently caught him with a female visitor in his room at NRLC.  When Mrs. Sadler confronted her husband, he admitted that, before the accident in question in this lawsuit, he had engaged in an adulterous affair with that female visitor and that he had also engaged in adulterous affairs with at least two of his wife's friends.  *See*, Deposition of Mrs. Sadler, Exhibit 20 to defendants' motion, pp. 85-88.  Defendants have presented evidence that, following Mr. Sadler's confession to adultery, Mrs. Sadler was "totally devastated" and stopped having Mr. Sadler make "home visits" to spend time with her.  *See*, Deposition of Salcedo, Exhibit 10 to defendants' motion, p. 126-127, 138-139.  Additionally, in the months following the confession, the staff at NRLC noted an increase in Mr. Sadler's hostility and in the frequency of his socially inappropriate behavior.  *Id.*, p. 127, 139 ("[B]ecause every time she tries to make some kind of healing, it's obvious that he can't.  And so she gets wounded all over again, and that escalates his behavior.  You know, it . . . is not a good thing, because it's hard for him to deal with").[6]

---

[6] Prior to that time, Mr. Sadler had apparently done well at NRLC and had even been extended an offer by the executive director to remain a part of the program following discharge serving as a mentor, and Mr. Sadler stated that he was very interested in that opportunity.  *See*, NRLC Report dated December 20, 2007, Exhibit 11 to defendants' motion, p. 8.  Furthermore, according the NRLC report dated December 20, 2007, Mr. Sadler's family was "very supportive of his rehabilitation program" prior to discovery of the extra-marital affairs and wanted him to

Defendants explain that Mr. Sadler's marriage has not recovered since his wife discovered his adultery, and Mr. Sadler has not returned home to spend time with his wife since January of 2009. *Id.*, p. 138-139. Defendants contend that they did not learn of Mr. Sadler's February 5, 2008 confession to adultery and of the associated changes in his marital relationship until they deposed Mr. and Mrs. Sadler on November 19, 2008, which was over five (5) months after the discovery deadline. Defendants argue that their experts are entitled to re-examine and re-test Mr. Sadler because, instead of remaining in the NRLC residential program for an additional sixty (60) to ninety (90) days as he was supposed to do prior to his February 5, 2008 confession to his wife, he has remained in the NRLC program for an additional twenty-one (21) months, and the NRLC presently has no time line for discharging him or transferring him to a less restrictive environment. *See*, NRLC Report dated January 20, 2008, Exhibit 12 to defendants' motion, p. 12 ("Mr. Sadler will require an additional 60 to 90 days of active rehabilitation"); Salcedo deposition, p. 152 ("[The monthly meeting where [NRLC] discussed discharging Mr. Sadler] was way back then right before the Mardi Gras event where the affair came out where they were thinking – having him ready to go home. That was the plans. That was not supposed to be a long-term stay" . . . "Q. And that changed after the Mardi Gras incident in 2008? A. Because his behaviors changed"). The Court agrees with defendants that, in order for there to be a "level playing field" among the parties' experts, the plaintiffs should not be able to present evidence of their expert neuropsychologist's evaluation and testing after the February 5, 2008 event, unless defendants' experts are also allowed an opportunity to re-examine and

---

come home "at the soonest opportunity." *Id.*, p. 12.

re-test Mr. Sadler since that event.

Other changes in Mr. Sadler's situation since the May 31, 2008 discovery deadline were reflected in the cognitive and behavioral testing performed by Levesque and Salcedo in May 2009. During her deposition, Levesque testified that Mr. Sadler's scores on the WMS III test administered in May 2009 reflected "significant improvement" in his immediate and delayed memory skills that have resulted from "everything that he's done here at the [NRLC] program." *See*, Levesque deposition, Exhibit 14 to defendants' motion, p. 63-66.[7] Defense experts are entitled to re-test Mr. Sadler to determine whether that is indeed the case. Furthermore, Levesque and Salcedo have testified that, currently, they are more concerned about Mr. Sadler's behavioral functioning, than his cognitive functioning, and that is the reason Mr. Sadler has not been discharged to a less restrictive environment. Specifically, they testified, during their depositions, that they believe Mr. Sadler is a danger to himself and/or to others because of his propensity to make racist and sexually inappropriate comments that could put him at risk of another person hurting him.[8] Defense experts should have the opportunity to test Mr. Sadler's behavioral functioning to determine whether it has changed since his last testing and whether he has become increasingly more hostile and inclined to make inappropriate remarks, resulting in his inability to be

---

[7] As mentioned above, based upon his May 2009 test scores, Levesque classified Mr. Sadler's immediate and delayed auditory and visual memory as normal or in the "average" range.

[8] *See*, Deposition of Salcedo, p. 131-132 ("I see that the possibility of him saying something inappropriate to somebody and having a brawl that is going to land him somewhere [in a very bad place, such as in jail or another facility]") and p. 132-133 ("I don't think it's his cognitive skills that are the problem. I don't think it's his memory, because he can use a PDA or – I don't think it's those things. I think it's his impulsivity and his lack of self-control and his judgment that are damning for him"); Deposition of Levesque, p. 78 ("Q. Why do you believe that Mr. Sadler is a danger to himself and to others? A. Because I think he could very easily say something inappropriate and another person could hurt him which would put him at a huge risk of sustaining another brain injury"); and p. 102 (indicating that she has overheard Mr. Sadler use racist remarks and jokes).

transferred to a less restrictive living environment (or to live independently) and his inability to return to work.[9]

Finally, defendants point out that, in January 2009, Mr. Sadler was placed on a new type of medication, Depakote, and that since being placed on that medication, the Executive Director of the NRLC, Hector Gutierrez, has noted a general improvement in Mr. Sadler's behavioral functioning.  *See*, Deposition of Gutierrez, Exhibit 18 to defendants' motion, p. 128.  Salcedo has also observed that the intensity and frequency of Mr. Sadler's inappropriate behavior has decreased since he started taking the medication.  *See*, Deposition of Salcedo, p. 129-130.  That additional change in Mr. Sadler's circumstances since the initial examinations and testing conducted by the defendants' experts warrants allowing those experts to conduct updated examinations and testing to determine the impacts of such medication upon Mr. Sadler's behavioral functioning.

Considering that plaintiffs have not submitted any arguments in opposition to defendants' present request for updated medical examinations by Dr. Glynn and Dr. Bianchini[10] and the Court finds that defendants have demonstrated "good cause" for those examinations, the Court will order that the examinations be conducted if they are subject to appropriate conditions.  The conditions suggested by the defendants (*i.e.*, that the defendants arrange and pay for Mr. Sadler's transportation to and from the testing; that defendants bear the cost of having an NRLC staff member accompany Mr. Sadler to the

---

[9] "Good cause" for a medical examination can be shown where health care providers indicate that a plaintiff continues to have complaints/problems as a result of his/her injuries up to the time of trial, as is the case with Mr. Sadler.  *Shapiro v. Win-Sum Ski Corp.*, 95 F.R.D. 38 (D.C.N.Y. 1982).

[10] Specifically, plaintiffs have not presented any arguments indicating that the defendants do not have a need for the information sought and that they have means through which they can obtain that information other than through updated medical examinations by Dr. Bianchini and Dr. Glynn. *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 240-245, 13 L.Ed.2d 152, 9 Fed. R. Serv.2d 35A.1 (1964).

examinations; that defendants will provide plaintiffs with a supplemental report regarding both evaluations on or before March 7, 2010; and that defendants must allow the plaintiffs to depose both experts before the start of trial on June 7, 2010) are appropriate and in accordance with applicable jurisprudence.[11] Those conditions allow sufficient time to set mutually agreeable dates for the examinations prior to February 7, 2010 and allow plenty of time for plaintiffs' counsel to review the supplemental reports of Dr. Bianchini and Dr. Glynn and to take their depositions prior to trial (*i.e.*, three months).[12] Thus, Dr. Bianchini and Dr. Glynn will be permitted to conduct the requested examinations subject those limitations.

Accordingly;

**IT IS ORDERED** that the Motion to Compel Updated Independent Medical Examinations (R. Doc. 63) filed by defendants, Daniel A. Acker, Schwerman Trucking Company, and Continental Casualty Company, is hereby **GRANTED** and that plaintiff, Troy

---

[11] *See, Shapiro v. Sin-Sum Ski Corp.*, 95 F.R.D. 38 (D.C.N.Y. 1982)(In a diversity personal injury suit, if defendant's physician examines the plaintiff, the examination is required to take place sufficiently before trial to permit a copy of the report to be prepared and delivered to the plaintiff in time for trial); Fed. R. Civ. P. 35(b)(The person examined is entitled, on request, to receive a copy of the examination report, which must be a detailed written report setting out the examiner's findings, including results of all tests conducted, diagnoses, and conclusions, together with like reports of all earlier examinations of the same condition); Prac. Guide Fed. Civ. Proc. Before Trial (5th Cir.), Ch. 11(IV)-E ("[S]ome courts permit the party's attorney or doctor to be present upon a showing of "good cause"); *Brown v. Ringstad*, 142 F.R.D. 461 (S.D. Iowa 1992)(Deposition of opposing party's expert medical witness can be taken when party which requested physical examination intends to use examiner as a witness at trial or upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts and opinions on the same subject by other means; *Rosenburg v. Greyhound Lines, Inc.*, 1987 WL 13134 (D.D.C. 1987)(Since the Court required the independent medical examination of the plaintiff to be performed in the district where the trial was to be held, it did not find that defendants were obligated to pay for the plaintiff's transportation for the purpose of the examination).

Because Mr. Sadler will have to be transported from the NRLC facility in Covington to Tuoro Rehabilitation Center in New Orleans for the updated medical examinations, defendants should be required to pay for the costs of transferring him to and from those facilities.

[12] The granting of defendants' motion also does not prejudice plaintiffs because they have never before taken the depositions of Dr. Bianchini and Dr. Glynn. Thus, they will not be required to take second, supplemental depositions of those experts due to the updated medical examinations. They can simply depose each expert one time and address all issues related to both their initial and updated medical examinations.

examinations; that defendants will provide plaintiffs with a supplemental report regarding both evaluations on or before March 7, 2010; and that defendants must allow the plaintiffs to depose both experts before the start of trial on June 7, 2010) are appropriate and in accordance with applicable jurisprudence.[11] Those conditions allow sufficient time to set mutually agreeable dates for the examinations prior to February 7, 2010 and allow plenty of time for plaintiffs' counsel to review the supplemental reports of Dr. Bianchini and Dr. Glynn and to take their depositions prior to trial (*i.e.*, three months).[12] Thus, Dr. Bianchini and Dr. Glynn will be permitted to conduct the requested examinations subject those limitations.

Accordingly;

**IT IS ORDERED** that the Motion to Compel Updated Independent Medical Examinations (R. Doc. 63) filed by defendants, Daniel A. Acker, Schwerman Trucking Company, and Continental Casualty Company, is hereby **GRANTED** and that plaintiff, Troy

---

[11] *See, Shapiro v. Sin-Sum Ski Corp.*, 95 F.R.D. 38 (D.C.N.Y. 1982)(In a diversity personal injury suit, if defendant's physician examines the plaintiff, the examination is required to take place sufficiently before trial to permit a copy of the report to be prepared and delivered to the plaintiff in time for trial); Fed. R. Civ. P. 35(b)(The person examined is entitled, on request, to receive a copy of the examination report, which must be a detailed written report setting out the examiner's findings, including results of all tests conducted, diagnoses, and conclusions, together with like reports of all earlier examinations of the same condition); Prac. Guide Fed. Civ. Proc. Before Trial (5th Cir.), Ch. 11(IV)-E ("[S]ome courts permit the party's attorney or doctor to be present upon a showing of "good cause"); *Brown v. Ringstad*, 142 F.R.D. 461 (S.D. Iowa 1992)(Deposition of opposing party's expert medical witness can be taken when party which requested physical examination intends to use examiner as a witness at trial or upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts and opinions on the same subject by other means); *Rosenburg v. Greyhound Lines, Inc.*, 1987 WL 13134 (D.D.C. 1987)(Since the Court required the independent medical examination of the plaintiff to be performed in the district where the trial was to be held, it did not find that defendants were obligated to pay for the plaintiff's transportation for the purpose of the examination).

Because Mr. Sadler will have to be transported from the NRLC facility in Covington to Tuoro Rehabilitation Center in New Orleans for the updated medical examinations, defendants should be required to pay for the costs of transferring him to and from those facilities.

[12] The granting of defendants' motion also does not prejudice plaintiffs because they have never before taken the depositions of Dr. Bianchini and Dr. Glynn. Thus, they will not be required to take second, supplemental depositions of those experts due to the updated medical examinations. They can simply depose each expert one time and address all issues related to both their initial and updated medical examinations.

D. Sadler, Jr., shall submit to a one (1) day examination by Dr. Kevin Bianchini, Ph.D. and a three (3) day examination by Dr. Gary Glynn at the Tuoro Rehabilitation Center on or before February 7, 2010, subject to the following conditions:  (1) Defendants will arrange transportation to and from the NRLC for Mr. Sadler; (2) Defendants will provide plaintiffs with a supplemental report regarding the updated evaluations on or before March 7, 2010; (3) Defendants will bear the additional cost of having an NRLC staff member accompany Mr. Sadler to each day of the examination; and (4) Defendants will consent to scheduling the depositions of both defense experts *after* the issuance of their supplemental reports, which will be at least three (3) months before trial.

Signed in chambers in Baton Rouge, Louisiana, November 2, 2009.

_____
**MAGISTRATE JUDGE CHRISTINE NOLAND**